**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE FRANCISCO VALLADARES, | 1:09-cv-00072-AWI-SMS (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| FRANCISCO JACQUEZ, Warden | [Doc. 1] |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

RELEVANT HISTORY

Following a jury trial in the Fresno County Superior Court, Petitioner was convicted of second degree murder in violation of California Penal Code section 187(a)[1], with personal use of a knife (section 12022(b)1) and for the benefit of a street gang (section 186.22(b)(1). Petitioner was also convicted of assault in violation of section 245(a)(1) with a gang enhancement (section 186.22(b)(1)). Petitioner was sentenced to three years for the assault with a deadly weapon plus an additional five years for the gang enhancement. He was sentenced to 15 years to life for the second degree murder conviction to run consecutive to the assault term with an additional one year for the weapon enhancement.

---

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

1

Petitioner filed a timely notice of appeal. On November 6, 2007, the California Court of Appeal, Fifth Appellate District, affirmed the judgment. (Lodged Doc. No. 4.)

On December 7, 2007, Petitioner filed a petition for review in the California Supreme Court. (Lodged Doc. No. 19.) The petition was denied without comment on January 16, 2008. (Lodged Doc. No. 20.)

The instant federal petition for writ of habeas corpus was filed on January 13, 2009. Respondent filed an answer to the petition on June 3, 2009, and Petitioner did not file a traverse. (Court Doc. 19.)

## STATEMENT OF FACTS

On the evening of March 11, 2005, a birthday party was held for Duran. Rodarte and Bladimir Urbina exchanged words at the first party. Rodarte was a Sureno gang member and Urbina was a member of a rival gang, the Nortenos. The mother of the person giving the party came home and made everyone leave. The partygoers left and went to a second location to continue the party.

Although there was no testimony that defendant was present at the first party, C and G testified that they rode from the first party to the second party in a car with defendant and others.

There were about 30 people at the second party; most of them were males. Rodarte and Urbina exchanged words at the second party. Rodarte was called a "scrap," a derogatory term for a Sureno gang member. Urbina, defendant, and others were arguing with Rodarte in the house. Defendant was talking "smack" inside the house.

Several people called Rodarte a scrap. In addition, they yelled to take him down, to kill him, and to get him. Defendant was heard saying that he was "strapped" (a slang term for carrying a weapon), saying, "Let's get him," and "Let's take him down."

Several females and Duran led Rodarte outside so he could leave. As the females led Rodarte down the street, a group of males exited the house. They followed and continued to yell "scrap," "kill him," "get him," and "take him down" at Rodarte.

The group of males following Rodarte rushed him. Defendant was part of that group. Rodarte started fighting. Duran ran toward the group to help his brother. Rodarte was pushed onto a car.

C was the only witness who could identify the person who stabbed Rodarte. She saw defendant take a knife out of his pants pocket. Defendant was right in front of Rodarte when defendant "launched" his knife at Rodarte. Defendant held the knife in his left hand. The thrust of the knife was slightly up. C was 100 percent sure at trial that defendant stuck a knife in Rodarte's chest.

|    |    |
|---|---|
| 1  | Duran was fighting with two males. One of the two had a knife and stabbed him. Duran saw about five members of the group with knives. Someone yelled out that the "cops" were coming, and the fight broke up. Defendant walked away from the fight and said, "Remember who did it. East Side Reedley Norte. Remember who put him down." |


Duran was fighting with two males. One of the two had a knife and stabbed him. Duran saw about five members of the group with knives. Someone yelled out that the "cops" were coming, and the fight broke up. Defendant walked away from the fight and said, "Remember who did it. East Side Reedley Norte. Remember who put him down."

A neighbor heard his dog barking violently. The neighbor ran outside with a bat and saw 10 to 12 people by his car fighting. The group was cursing and yelling "East Side Reedley," a gang name. The group moved away from the neighbor's car when he came out with the bat. The fight broke up and he saw four or five of the fighters run to a maroon four-door vehicle.

C testified that as defendant left the fight he held the knife in the air and waved it around. He said to Rodarte, "Remember who brought you down. It was me."

Rodarte walked away after the fight. He collapsed and died shortly thereafter. Rodarte was stabbed three times. The cause of death was perforation of the heart from a sharp cutting instrument. The wound to his chest was 1-1/2 inches in length and 4-1/2 inches in depth. The cut started at the skin, went through bone and then into Rodarte's heart. Rodarte also had a stab wound to his left arm and a stab wound to the left side of his back.

G and C were both shown photographic lineups. In the first photographic lineup, they each identified a photograph of defendant's brother as "Pacman" and as being involved in the fight that evening. After it was learned that defendant's brother was not present at the party that evening and that defendant's nickname was Pac or Pacman, another lineup was prepared containing defendant's photograph. G identified defendant's picture in the second photographic lineup as a person she saw involved in the fight that evening and thought he was the same person she had identified in the previous lineup. C realized she made a mistake in her identification during the first lineup after she saw the second lineup. She identified defendant's photograph as Pacman and as the person she saw stab Rodarte in the chest.

Defendant was interviewed at the police station. During the interview he repeatedly denied being at the party that night. After 48 minutes of questioning, he finally admitted being at the scene but claimed he was hit in the back of the head after he exited the house. After he was hit in the back of the head, he got in a car and left. He denied going down the street in the group that followed and then rushed Rodarte.

James Lyman, an expert on criminal street gangs. testified that the East Side Reedley Nortenos is a criminal street gang and that defendant is a member of that gang. He testified that Rodarte was a member of the Surenos, a rival gang of the Nortenos. Lyman testified regarding the predicate crimes and the other elements necessary to show that a gang is a criminal street gang. It was his opinion that the crimes here were committed for the benefit of and in association with a criminal street gang.

**Defense**

Defendant's mother testified that Carlos Gonzalez came to her home after defendant was arrested for the murder of Rodarte. Defendant's girlfriend, Jesenia Becerra, was there and defendant's mother told her to stay back in the hallway

while the mother spoke to Gonzalez. Defendant's mother testified that Gonzalez told her not to worry-that he killed the guy and he was going to turn himself in. The mother also testified that defendant writes with his right hand.

Becerra testified that defendant was her boyfriend in March of 2005 and is currently her fiancé. She testified that she overheard Gonzalez tell defendant's mother that he, Gonzalez, was the person who stabbed the guy and if something went bad in court he would turn himself in.

Serena Alvarez attended the party where Rodarte was killed. She went to the party in a red Camry four-door car. She saw a group of men around Rodarte and saw him pushed against the car. She could not see defendant. The group broke up and she went to the car and got in with Amy, the driver. Four males jumped in the car with them. The males were defendant, Juanito, Gonzalez, and a drunken person she could not identify. She said Gonzalez was holding a knife with red liquid on it. He was wiping the knife and said he stuck the victim a "grip" of times.

Alvarez and the others drove to Juanito's house and went inside. Others came to the house also, and they talked about what had happened. Gonzalez had the knife in the bedroom; he was stroking it and cleaning it.

About two weeks after the murder, Alvarez was with Amy cleaning the Camry. Alvarez found a knife underneath the driver's seat. She took the knife home and kept it for about a year. She then turned the knife in to a defense investigator. She washed the knife before she turned the knife in. She said she did not turn the knife in earlier because she was afraid.

**Rebuttal**

When defendant's mother was interviewed by police, she said that defendant was asleep the night of the murder and there was no way he left the house or she would have heard him.

(Lodged Doc. No. 4, Opinion, at 2-5.)

DISCUSSION

A.  Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

4

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.     Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams (Terry) v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id., quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) (*per curiam*). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court

and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991). However, where the state court decided an issue on the merits but provided no reasoned decision, courts conduct "an independent review of the record . . . to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

C.   Insufficient Evidence to Support Murder Conviction

Petitioner contends that there was insufficient evidence to convict him of murder. Petitioner claims that witness, Clarissa Frausto, who testified that she saw Petitioner stab the victim, was "only 14 at the time of the incident." He also claims that her description of the incident was physically impossible and inherently improbable, and his due process rights were violated.

In rejecting Petitioner's claim, the California Court of Appeal, held as follows:

> Defendant contends the evidence was insufficient to establish that he killed Rodarte. He claims that the testimony of C was both physically impossible and inherently improbable. In particular, he highlights portions of C's testimony that did not exactly match the testimony of the autopsy physician. To support his assertion, he points to the fact that no other witnesses positively identified him as the person who stabbed Rodarte, that another man was seen with a knife in his hand, and that C had a motive to lie because Juan Pantoja was implicated as the killer by other witnesses and he was the ex-boyfriend of C's cousin.
>
> The standard of review is well settled: On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence- - that is, evidence that is reasonable, credible and of solid value- - from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1572.) In considering the evidence in a light most favorable to

6

the judgment we "presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment." (*People v. Mincey* (1992) 2 Cal.4th 408, 432.)

C testified that she saw defendant remove a knife from the left pocket of his pants and "launch" it into Rodarte's chest using his left hand. She demonstrated the motion to the jury as a thrusting motion out in front and slightly up. On cross-examination, she was reminded that she told detectives that the knife was launched and then twisted in Rodarte. She then demonstrated what she saw, making the same motion she made during her earlier demonstration and adding a clockwise twisting motion. She testified the twisting occurred after she saw the knife go in. On redirect examination, she clarified that she saw the motion of defendant's hand; she did not see the motion of the knife.

The physician who performed the autopsy testified that he did not see any evidence of twisting, although he noted twisting can occur without leaving any evidence of twisting in the injury. The physician said the knife wound path was front to back and slightly downward.

The physician noted his description of front to back and downward was based on the universal position of a person in a flat position, it does not take into account that the person could be leaning forward or backward when the wound is inflicted. He also testified that the movement of the body or the knife is a dynamic process and both could be moving at the same time. In that situation, one may or may not see twisting in the wound. He said there was some evidence of twisting in Rodarte's chest wound. In addition once a knife has gone into a bone there is resistance that can minimize the amount of twisting.

We do not agree with defendant when he states that C's description of the stabbing was physically impossible. We further find there is nothing in the record to show that a right-handed person is incapable of inflicting a stab wound using his left hand. The stabbing as described by C was not physically impossible. Her testimony, standing alone, was more than sufficient to support the murder conviction.

Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth of falsity of the facts upon which a determination depends. [Citation.] (*People v. Barnes* (1986) 42 Cal.3d 284, 306.)

(Lodged Doc. No. 4, Opinion, at 5-7.)

The law on insufficiency of the evidence claim is clearly established. The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from

7

it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16. In reviewing the sufficiency of the evidence, this Court does not "question a jury's assessment of witnesses' credibility" but rather presumes that the jury resolved conflicting inferences in favor of the prosecution. The issue of whether Clarissa's testimony was physically impossible and inherently improbable was properly assessed by the jury in this instance. In addition, there is no showing that Clarissa was not capable of identifying Petitioner as the perpetrator because she was 14 years old at the time of her testimony. Indeed, the evidence suggests otherwise. Accordingly, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

D.      Insufficient Evidence to Support Assault With Deadly Weapon Conviction

Petitioner also claims that there was insufficient evidence to prove beyond a reasonable doubt that he was guilty of assault with a deadly weapon (a knife) as an aider and abettor in the group assault of Fabian Duran. He claims there was no evidence that he knew the other assailants were armed with deadly weapons.

The California Court of Appeal rejected the claim in the last reasoned opinion finding:

> [A] defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime that is the 'natural and probable consequence' of the target crime." (*People v. Prettyman* (1996) 14 Cal.4th 248, 261.)
>
> Defendant was convicted of assault with a deadly weapon on Duran based on the fact that he aided and abetted the assault. Defendant claims that because there was no evidence that he knew prior to the fight that anyone was armed with a knife, all that was shown was that he participated in a fistfight. Defendant relies on *People v. Butts* (1965) 236 Cal.App.2d 817 to support his position.
>
> We find the answer to defendant's argument in the case of *People v. Montes* (1999) 74 Cal.App.4th 1050. In *Montes*, the defendant claimed his conviction for assault with a semi-automatic rifle had to be reversed because at the time he involved himself in a gang confrontation with a rival gang he did not know that his co-gang member, Cuevas, was armed with a firearm. The defendant in Montes placed reliance on the Butts case just as defendant does here. The appellate court rejected his argument, and we find its analysis precisely on point.

>In *Butts*, defendants Otwell and Butts were involved in a brawl with a group of strangers. Although the altercation began as a fistfight, Otwell eventually pulled a knife and fatally stabbed one of his foes. The court decided Butts could not be held responsible for the killing under aiding and abetting principles because there was "no evidence that [he] advised and encouraged use of a knife, that he had advance knowledge of Otwell's wrongful purpose to use a knife or that he shared Otwell's criminal intent to resort to a dangerous weapon." (*People v. Butts*, *supra*, 236 Cal.App.2d at p. 836.) In other words, Butts was off the hook for the stabbing because he was aware only of a fistfight, not a knife fight. (*Id*. at p. 837.)
>
>To the extent Butts requires one accused of aiding and abetting to know of and encourage the perpetrator's intended use of a weapon, it is out of step with Supreme Court authority. (*People v. Godinez* (1992) 2 Cal.App.4th 492, 501, fn. 5.) 'The only requirement is that defendant share the intent to facilitate the target criminal act and that the crime committed be a foreseeable consequence of the target act. [Citation.]' (*Ibid*.)
>
>Butts is also more than three decades old, a remnant of a different social era, when street fighters commonly relied on fists alone to settle disputes. Unfortunately, as this case illustrates, the nature of modern gang warfare is quite different. When rival gangs clash today, verbal taunting can quickly give way to physical violence and gunfire. No one immersed in the gang culture is unaware of these realities, and we see no reason the courts should turn a blind eye to them. Given the great potential for escalating violence during gang confrontations, it is immaterial whether Montes specifically knew Cuevas had a gun. (*People v. Montes*, *supra*, 74 Cal.App.4th at pp. 1055-1056.)
>
>Here it is immaterial whether defendant knew that others had knives when the clash occurred. The assault with a deadly weapon was a natural and probable consequence of the initial confrontation. It was reasonably foreseeable that the confrontation would escalate to an assault involving knives. Substantial evidence supports defendant's conviction as an aider and abettor of assault with a deadly weapon.

(Lodged Doc. No. 4, Opinion, at 7-9.)

Construing the prosecution's case in the light most favorable to the State, as this Court must do, a rational trier of fact reasonably could have found that Petitioner was aware that other members of his gang were armed and would assault rival gang members. Jackson v. Virginia, 443 U.S. at 319. Considering the testimony regarding the violent nature of gang rivalries and given that the confrontation was between two rival gangs, it was certainly reasonably foreseeable that the confrontation would escalate to an assault involving knifes. In this instance, Petitioner was in the immediate presence of the argument between Rodarte and Urbina, and was heard saying "get him" and "kill him" he is a scrap-rival Norteno gang member. Indeed, Petitioner himself was armed with a weapon and killed Rodarte. Thus, there is no doubt that he shared in

the perpetrator's intent to assault Fabian Duran. Therefore, the evidence was sufficient for the jury to find beyond a reasonable doubt that Petitioner was guilty as an aider and abetter of the assault with a deadly weapon, and the state court's rejection of this claim was not an unreasonable application of the Jackson standard. 28 U.S.C. § 2254(d).

E.      Gang Expert Testimony

Petitioner contends that the gang expert's reliance on hearsay as a basis for his opinions violated his Sixth Amendment right to confrontation and the holding of Crawford v. Washington, 541 U.S. 36 (2004).

In denying Petitioner's claim, the California Court of Appeal ruled as follows:

> In addition to convicting defendant of murder and assault with a deadly weapon, the jury found that defendant committed the crimes for the benefit of a criminal street gang. Officer Lyman testified as a gang expert. He testified about gangs in general. To show the existence of predicate offenses, necessary to prove the gang enhancement, he utilized court documents to prove the convictions of two East Side Reedley Norteno gang members.
>
> The expert relied on validation memos concerning defendant, and he also had at least one contact with him. Defendant had previously said he was a gang member of the East Side Reedley Nortenos. The expert testified that Rodarte was a member of the Sanger Surenos. On cross-examination, the expert stated that he based his opinion that Rodarte was a validated gang member on an interoffice memo that indicated that while Rodarte was in jail he admitted he was a Sureno member.
>
> Relying on *Crawford v. Washington* (2004) 541 U.S. 36, defendant claims that it was error for the expert to rely on the validation memos, the interoffice memo, and the court documents to prove the gang enhancements because the expert's reliance on this hearsay evidence violated defendant's right to confront and cross-examine the witnesses against him.
>
> In *Crawford*, the United States Supreme Court held that testimonial out-of-court statements are inadmissible unless the declarant is unavailable and the accused has had an opportunity to cross-examine the declarant. (*Crawford v. Washington*, *supra*, 541 U.S. 36.)
>
> Defendant's argument has been rejected in *People v. Thomas* (2005) 130 Cal.App.4th 1202, a case that defendant claims is wrongly decided. In *Thomas*, other gang members told the expert that defendant was a member of a gang. The expert utilized this evidence in reaching his conclusion that the defendant was a gang member. The defendant claimed on appeal that the statements were hearsay and their introduction violated his Sixth Amendment rights as explained in *Crawford*. The Court of Appeal disagreed. "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her

10

> opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion. *Crawford* itself states that the confrontation clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' [Citation.]" (*People v. Thomas*, *supra*, 130 Cal.App.4th at p. 1210.)
>
> Subsequent to the *Thomas* decision, the court in *People v. Ramirez* (2007) 153 Cal.App.4th 1422 followed *Thomas* and rejected the defendant's argument that the court "denied him his right to confront witnesses when it allowed hearsay testimony about the facts of the predicate crimes." (*Id*. at p. 1426.)
>
> We find the *Thomas* and *Ramirez* opinions to be well reasoned, and we reject defendant's suggestion that we disagree with *Thomas*. In addition, we note that there was an abundance of evidence presented at trial demonstrating the gang nature of the offenses here, and present conduct may be used in determining the group's primary activities (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323); that defense counsel did not object to the admission of the evidence based on Crawford; and it was the defense that brought up the interoffice memo to demonstrate that Rodarte was a gang member.
>
> Defendant has not demonstrated error.

(Lodged Doc. No. 4 at 9-11.)

The Confrontation Clause of the Sixth Amendment gives a defendant the right "to be confronted with the witnesses against him." "[T]he Confrontation Clause guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" Kentucky v. Stincer, 482 U.S. 730, 739, 107 S.Ct. 2658 (1987) (quoting Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292 (1985). "The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." Fensterer, 474 U.S. at 21-22, 106 S.Ct. 292. Simply stated, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Crawford v. Washington, 541 U.S. at 59, n.9 (citing Tennessee v. Street, 471 U.S. 409, 414 (1985); see also Moses v. Payne, 555 F.3d 742, 755 (9th Cir. 2009).

Here, as stated by the appellate court, the testimony by Officer Lyman regarding the validation memos was admitted as part of his explanation for his expert opinion that Petitioner was a member of the East Side Reedley Norteno gang.  Thus, the evidence was not admitted for the truth of the matter, and the trial court advised the jury several times that such evidence was only admitted to explain the basis for Officer Lyman's testimony and not for its truth.  (CT 300.)  We must assume that the jury followed those instructions.  See Richardson v. Marsh, 481 U.S. 200, 206 (1987) (noting that "almost invariable assumption of the law that jurors follow their instructions").  Therefore, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

F.      Ineffective Assistance of Trial Counsel

Petitioner contends that trial counsel was ineffective for failing to object to the expert witness's reliance on hearsay as a basis for his opinion.

As an initial matter, Respondent submits that this claim is unexhausted.  On the form petition, Petitioner concedes the claim is unexhausted by stating: "The ineffective assistance of counsel claim was brought up in Superior Court under Ground 3 (see Ground 3) but was never brought up in the [California] Supreme Court for unknown reasons to appellant."  (Petition, at 5.)[2]

A petition containing both exhausted and unexhausted claims is subject to dismissal as a mixed petition.  Rose v. Lundy, 455 U.S. 509 (1982).  The purpose of the exhaustion rule is to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal court, and to "protect the state courts' role in the enforcement of federal law."  Rose v. Lundy, 455 U.S. at 518.  A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court.  Picard v. Connor, 404 U.S. 270, 276, 92 S.Ct. 509, 512 (1971); Johnson v. Zenon, 88 F.3d 828, 829 (9th Cir. 1996).

---

[2] The pagination of the petition is not in proper format.  This statement occurs on the sixth page of the Petition but the bottom of the page refers to it as "Page five of six."

This Court can deny an unexhausted claim if it is clear that no colorable claim is stated. Cassett v. Stewart, 406 F.3d 614, 623-624 (9th Cir. 2005). For the same reasons explained *supra*, because there was no ineffectiveness of counsel under *Crawford* for failure to object to the expert's reliance on hearsay evidence, any objection by trial counsel (which Petitioner seems to acknowledge trial counsel attempted to do at trial) would have been futile at trial.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED; and

2. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   February 22, 2010**          /s/ Sandra M. Snyder
                                                            UNITED STATES MAGISTRATE JUDGE